Good morning. Frederick Carroll for Mr. Excuse me. Now that I have a voice, Frederick Carroll for Mr. Minero-Rojas. Good morning, Your Honors. Good morning. Mr. Minero-Rojas case is before the court today with several issues all stemming around two essential ideas. One is that he had a derivative citizenship claim, which he did not have a proper opportunity to ferret out and present before the court. How did he not have the proper opportunity? The I.J. himself raised it and thrust it in his face, and your client said, I'm not interested. Multiple times. That's correct, Your Honor. I think the transcript does. So how did he not have the opportunity? I think the transcript shows that the waiver or the I don't want to pursue this any further submitted by Mr. Minero-Rojas at the I.J. hearing in 1997 was not an informed and intelligent waiver. This is borne out by the fact that when questioned by the I.J. about a possible derivative citizenship claim based on his mother being born in the United States, Mr. Minero-Rojas, in a very defeatist way, said, my brother tried that, used my mom as a reference. It didn't work. From that assertion from Mr. Rojas, it's clear that he didn't understand the question, that he had actually a claim to citizenship, not just a reference from his mother to show that he's a good guy. It's clear from his responses to the immigration judge that he didn't understand what was going on. While the judge clearly understood that there were legal standards and criteria for a derivative citizenship claim, raised the issue, it was also clear that Mr. Minero-Rojas had absolutely no idea what was being discussed and just wanted to go forward with his defeatist position, saying, I just want to get out of here. So how can you tell us he didn't have the opportunity? The opportunity was squarely presented to him and he declined it. Now, it may have been a bad decision, but he surely had the opportunity. And he, and the I.J. made a point of telling him, you can keep doing this, you can raise your citizenship issue forever, you, he's not prevented from doing anything thereafter, and it appears he did nothing thereafter. He had plenty of time to get himself informed, he did nothing. So how can you tell me that he didn't have the opportunity? He had scans of opportunities. Yeah, opportunities, Your Honor, but it was based on being informed of things that he had no concept of what he was talking about. Wasn't it incumbent upon him, since the I.J. told him, you may have something here, shouldn't he have taken the hint and gone to see if he had something, and done something, and he didn't? Absolutely, he should have pursued the claim further. He hasn't presented to this Court a perfected claim for derivative citizenship, and I'm not before the Court presenting anything to, you know, to that extent. What we're contending, however, is that there is a procedural flaw, because when advised of an opportunity that is not explained, essentially, Mr. Minero-Rojas is being told, in essence, without belittling the argument, Mr. Minero-Rojas, there could be a unicorn that would save you. I don't know what that is. He wasn't told there was a unicorn. The I.J. brought it up himself specifically. Indeed, he said language that he thought the – let's see here. The first thing that jumps out at me about your case, you've been here for a long time legally, you might qualify for cancellation or removal. You interested? The judge isn't telling him it's a unicorn. The judge is initiating it and telling him to think about this. Maybe he didn't think about it enough. Maybe he wasn't informed. But his answer repeatedly was, no, I'm not interested. So how does that mean we're supposed to disregard that removal as being in violation of due process? And I apologize. My characterization with the unicorn is unarticulable. I withdraw that. But let me just – let me just ask you this way, if you're – how – a little different way. What at that point should the I.J. have done? The I.J. should have said, sir, you have these things. This is what – because the issue is raised, this is what you should pursue. Sir, it sounds like you have this. This has come up before. Explain to him what derivative citizenship is and at least point him in the right direction rather than letting that issue die on the vine procedurally. With that, a more compelling issue for Mr. Monero-Rojas, other than the derivative citizen issue, is the 212C issue presented in this case. With respect to that, two issues come up here. The first centers on the equities that, admittedly, Judge Moskowitz considered and presented for this court in a written order about Mr. Monero-Rojas. Mr. Monero-Rojas here has four United States citizen children, a United States citizen wife, a United States citizen mother, and seven United States citizen siblings. It's in the record that Mr. Monero-Rojas is – has been and, in 1997, was caring for his mother, who has been suffering from increasingly debilitating Alzheimer's disease. The pernicious problem here that leads to the prejudice suffered by Mr. Monero-Rojas is that now presented to him, he doesn't have the availability with his mother's deteriorated mental condition to pursue what he could have before. And I guess I'm not understanding what you're arguing here. Monero-Rojas, Jr. Two – two factors, thank you. An appeal from an illegal entry? Yes, Your Honor. And I understand that you're attacking the validity of the deportation. Correct, Your Honor. Now, the 212C relief goes to what? The 212C relief goes to whether or not he was counseled or should have been counseled that he had relief in 1997 from deportation that he could have pursued that would have perhaps saved him from the troubles that leave him. Oh, I see. This is still another ground that he could have pursued if he had known about it. That's correct, Your Honor. And what exactly is the relief that he could have pursued? Through 212C relief, he could have showed that the discretionary relief could have been granted to him, one, because of what's generally referred to as humane factors or unnecessary prejudice to him or unusual equities that he presented. Well, his problem was a pretty extensive criminal history, which Judge Moskowitz catalogued. Is relief seriously in the cards? Your Honor, we're presenting the case to the Court that is not denying his criminal history. Obviously, we can't do that. Rather, we're saying that with the equities presented to the Court, there is a twofold problem where Judge Moskowitz, we believe, got it wrong in his analysis in weighing the possibility for relief. Certainly, Mr. Monero-Rojas has a serious criminal record. There's – that exists, and that's a fact that we have to deal with. You've been dealt certain cards to play. That's what you've got to play. That's what we've got, Your Honor. However, with the equities presented, we believe that the calculus employed by Judge Moskowitz was wrong. He got the standards absolutely right. It came down on the wrong side. Mr. Monero-Rojas' criminal history, while serious, stems from a lot of things, receipt of stolen property, drug possession, things that go along with drug addiction, but not the kind of serious felonies that would – that this Court sees all the time as reasons for deprecation in 1326 cases. However, here, Mr. Monero-Rojas did have these unusual equities, and where we take particular issue with Judge Moskowitz balancing calculus in this case is Judge Moskowitz says these are situations that present themselves regularly in the Southern District of California, and they don't rise to the level of being uncommon or unduly prejudicial. Unfortunately, I think this comes from a somewhat jaded perspective, being in the Southern District of California, where we have so many people  The fact that they're existing in the Southern District of California means that their unusual hardships and prejudice faced by them are common, but the commonality of the prejudice and the undue hardship faced by them does not mean that these are unnecessary or unduly prejudicial. For instance, specifically, Your Honors, if Mr. Monero-Rojas were a Kansan, it would seem that people in Kansas would say, wow, this gentleman has quite a few ties to the community, and we wouldn't we look more at those as being some sort of a mitigating factor that would lead to discretionary relief from a panel or from an immigration judge, rather than in the context of the Southern District of California where we see this kind of a situation all too common. In some, Your Honors, this case is not. So Judge Thunheim from Minnesota would have reached a different result here, so therefore, I don't know if he would have reached a different result, but certainly there wouldn't be the same just sheer volume of people who have the exact same types of undue burdens and hardships placed upon them in Minnesota that are here in Southern California. And the sheer volume, I think, skews the analysis here sometimes. I mean, the commonality shows that they're not undue, but the commonality doesn't mean that they're not unduly prejudicial. It just means that unduly prejudicial circumstances happen quite often here. With that, Your Honors, I see my time is running up. I will reserve the remaining few moments for rebuttal, unless the Court has any questions at this time. Thank you very much. We'll reserve, and we'll hear from the government. Good morning, Your Honors. Charlotte Kaiser on behalf of the United States. Mr. Monero-Rojas was subject to a valid deportation, not once, but thrice. The focus of Mr. Monero-Rojas, the thrust of his argument is that the 1997 deportation was invalid based on the immigration judge's failure to painstakingly go over everything he would have had to pursue for a claim of derivative citizenship. But as the record clearly shows, the immigration judge fulfilled his duty to advise Mr. Monero-Rojas of his apparent eligibility of relief from removal as to derivative citizenship. And he didn't just say at the beginning, I believe you may have a claim for derivative citizenship. He said, it appears to me that you may have a claim, you may be a citizen, I'm not quoting exactly from the record, but citizen from your mother. Not even saying a term such as derivative citizenship, so that he didn't have to, he actually broke it down for him and he re-approached it many different times. As Judge Moskowitz said in his order, the immigration judge was under no duty to force it upon him. The argument really is, well, he wasn't presented a meaningful opportunity to fully explore that. But the cases relied on, Mr. Monero-Rojas says to that, actually deals with litigants who were pursuing claims of relief. Adjustment of status in the Agamemn case, asylum in the Jactino case. They were actually pursuing those claims of relief. And in fact, as this court has stated in other cases regarding derivative citizenship, in Aya Villanueva, derivative citizenship is determined under the law, in effect, at the time of the critical events, giving rise to eligibility. And even in Mr. Monero-Rojas' brief, he distinguishes in terms of, well, if his parents were married, this is how much residency. But if they were not married, this is how much residency. It's a complicated issue. And so the fact of the matter is, is had Monero-Rojas actually explored those parameters, perhaps there would be an issue down that line. But given the fact that he said, no, no, no, I don't want, the judge kept prodding, the judge can't force him to pursue it. Regarding the 212C equities, there's no disagreement about what is the proper standard to apply. I think the cases that we cited, I believe, concern other jurisdictions, not just the Southern District of California. I think it's the standard in and of itself. And in fact, Your Honor, Your Honors, I actually appeared before this court in front of you, a little over a year ago, in United States v. Skaffrey. You're a recidivist. I'm a recidivist, yes. As to this particular issue, and in United States v. Skaffrey, which was interesting about the case, the issue was, well, should he have been advised that he had that standard so he could make that argument? But really what the court came down to in United States v. Skaffrey is even if he had been advised as to that standard, the length of residence and family ties is not sufficient to rise to that level for that type of equities test. And then regardless, you have this criminal history. And Mr. Monero-Rojas' case, certainly in equities, the fact that he had 27 years, but he had a significant criminal history during that time. And in 1997, he had a robbery conviction that was only five years old, and then he had the drug conviction in 1995. As to these other issues, I'm happy to address the 2002 and 2007 expedite removals, unless if the court has any questions as to those. Otherwise, I would submit. Thank you. Thank you very much. We'll have rebuttal. In, I think, 42 seconds I have left, I would just like to reiterate, Your Honors, and try to clarify that Mr. Monero-Rojas does have a good, compelling set of equities. As Ms. Kaiser just reiterated, 27 years, four United States citizen children, seven United States citizen siblings, and a mother with deteriorating Alzheimer's who it's uncontested he was helping provide care for. Vis-a-vis his criminal history, which is extensive, but consisting mostly of misdemeanors, with the exception of a term where he did three years in 1992, Mr. Monero-Rojas does not have crimes of violence, given that his extensive ties to the community. Whether or not he has a derivative citizenship claim that kind of died on the vine and was unable to pursue, he still had equitable concerns. He still suffered prejudice. That prejudice is something commonly faced in this district and others, but not one that leads to the decision Judge Moskowitz made in the weighing calculus. His criminal history does not outweigh the positive aspects and ties he had, and discretionary relief should have been available to him. Thank you very much. Thank both counsel. Case just argued is submitted. We'll take a short recess.
judges: Tunheim, Schroeder, Clifton